# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SARAH WHALEN,  and | * | CIVIL ACTION NO. |
| THEODORE A. "TED" LADNER, JR., and | | |
| LADNER'S INDUSTRIES CO., | * | SECTION |
|     PLAINTIFFS | | |
| versus | * | JUDGE |
| MARK E. MORICE, and | | |
| MORICE LAW FIRM, LLC, and | * | MAGISTRATE |
| CITY OF NEW ORLEANS, and | | |
| DET. ROGER CAILLOUET, Individually | * | |
| and in his official capacity as a police officer | | |
| with New Orleans Police Department, and | * | |
| DET. TY WILTZ, Individually and in his | | |
| official capacity as a deputy with | * | |
| Plaquemines Parish Sheriff's Office, and | | |
| GERALD A TURLICH, JR., In his official | * | |
| capacity as Sheriff of Plaquemines Parish, | | |
| and DOUGLAS S. HAMMEL, and | * | |
| THE HAMMEL LAW FIRM, LLC, and | | |
| KEITH LOBRONO, and | * | |
| NETWORK STRATEGIST, and | | |
| GILSBAR, L.L.C., andCONTINENTAL | * | |
| CASUALTY COMPANY, | | |
|     DEFENDANTS | * | |

**************************************

## VERIFIED COMPLAINT

**NOW COME PLAINTIFFS,** Sarah Whalen, Theodore A. "Ted" Ladner, and Ladner's Industries Co., through undersigned counsel and for their complaint against Defendants, aver upon information and belief as follows:

### I.     NATURE OF THE ACTION

1. Plaintiffs file this complaint for the violation of their civil rights, the violation of federal law by individuals acting under the color of law, and defamation, abuse of process, intentional infliction of emotional distress, malicious prosecution and negligent infliction of emotional distress against the parties made Defendants and identified hereby.

2. Mark Morice and some of the Defendants, who include law enforcement officers, a licensed private investigator, and licensed attorneys, violated federal law, including 42 U.S.C. §1983 and 18 U.S.C. §2721, to obtain Plaintiff Whalen's protected private name and personal information, as well as that of David Bruce Spizer, who has filed a separate lawsuit. On information and belief, Defendants Caillouet, Wiltz, Turlich, and/or Lobrano violated federal law by providing Plaintiff Whalen's protected private name and personal information to Morice and others, which enabled Defendant Morice to identify the defendants and to file a petition in Louisiana state court wrongfully seeking a temporary restraining order and preliminary injunction, groundlessly and falsely accusing Plaintiffs and Spizer of conspiring together and stalking and harassing Morice, his wife Heidi Nuss and their children, using "multiple vehicles" including Whalen's to carry out the alleged conspiracy, and further falsely to accuse Whalen of attempting to murder Morice by hitting him and driving over him with her car as part of this conspiracy, when at all times, Morice knew these claims were untrue and meritless. The underlying case in Louisiana

State Court is identified as "Morice v. Whalen," Civil District Court for the Parish of Orleans,  No. 2019-4676

3.  On information and belief, Defendants Morice, Morice Law Firm, L.L.C., and Lobrano then spent almost a year conducting illicit, harassing and abusive surveillance of Plaintiffs, including but not limited to near-daily following of Plaintiff Whalen and also conducting surveillance during depositions, deposition breaks, and Plaintiffs' private conversations with her attorneys. This surveillance continued despite objections from Plaintiffs and their lawyers, as well as objections of other witnesses and their lawyers, resulting in an abuse of process.

4.   Spizer, Ted Ladner and Ladner's Pools had not committed any acts as Defendant Morice claimed, and those parties were dismissed by the Court. Morice's claims against Whalen for a temporary restraining order and preliminary injunction have been dismissed by the state court.

5.  As a result of all Defendants' actions, Plaintiffs' civil rights were crushed, their reputations were damaged, and they suffered extreme emotional distress, without any justification by Defendants, and with Defendants acting intentionally and with malice. Plaintiffs now seek relief, and they reserve their right to amend this complaint to include any new allegations that relate to the causes of action stated hereby, including the violations of federal statutes and defamation, abuse of process, intentional and/or negligent infliction of emotional distress, malicious prosecution, and the violation of Plaintiffs' civil rights.

## II. JURISDICTION AND VENUE

6. The first count of this action rises under 42 U.S.C. § 1983. This Honorable Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. Section 1343.

7. The second count of this action arises under the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721–2725. This Honorable Court has jurisdiction under 18 U.S.C. § 2724 and 28 U.S.C. § 1331.

8. The subsequent counts of this action arise under Louisiana law. This Honorable Court has supplemental jurisdiction under 28 U.S.C. § 1367 because these claims are "so related to claims in the action with such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." It is appropriate that this Honorable Court sustain jurisdiction in the pendant state law claims independent of the violations of the federal statutes.

9. Venue is proper in this Honorable Court under 28 U.S. C. Section 1391(b)(2) because this Court is in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."

## III. PARTIES

10. Made Plaintiff (1) hereby is Sarah Whalen ("Whalen"), a citizen and resident of the Parish of Orleans, State of Louisiana, who is an attorney authorized to practice law in the State of Louisiana.

11. Made Plaintiff (2) hereby is Theodore A. "Ted" Ladner, Jr. (Ted Ladner), a citizen and resident of the Parish of Jefferson, State of Louisiana, who is the owner and operator of Ladner's Industries Co..

12.     Made Plaintiff (3) hereby is Ladner's Industries Co. ("Ladner's Pools"), a corporation chartered by the State of Louisiana with its domiciled and principal place of business in the Parish of Jefferson, State of Louisiana, which engages in the business of building and maintaining swimming pools and spas, and commercially selling related products, goods and services.

13.     Made Defendants hereby, are:

(a)     Mark E. Morice, an individual and also a reserve deputy with the Plaquemines Parish Sheriff's Department, an attorney authorized to practice law in the State of Louisiana and a resident of the Parish of Orleans, State of Louisiana;

(b)     Det. Roger Caillouet, a detective with the New Orleans Police Department and believed to be a resident of the Parish of Jefferson, State of Louisiana;

(c)     Ty Wiltz, a detective with the Plaquemines Parish Sheriff's Office and believed to be a resident of the Parish of Plaquemines, State of Louisiana;

(d)     Sheriff Gerald Turlich, Jr., in his capacity as Sheriff of Plaquemines Parish Sheriff's Office, and employer of Ty Wiltz and Mark E. Morice vicariously liable for their actions under color of law in the course and scope of their employment as to the state law claims;

(e)     the City of New Orleans, a municipality with the Parish of Orleans, State of Louisiana and employer of Det. Roger Caillouet, vicariously liable for his actions under color of law in the course and scope of his employment as to the state law claims;;

(f)     Morice Law Firm, LLC, a Louisiana limited liability company domiciled in the Parish of Jefferson, State of Louisiana, whose manager and sole member is Mark Morice;

(g)  Douglas S. Hammel, an attorney authorized to practice law in the State of Louisiana and a citizen and resident of the Parish of Orleans, State of Louisiana;

(h)  The Hammel Law Firm, LLC, a Louisiana limited liability company domiciled in the Parish of Jefferson, State of Louisiana, whose sole member is Douglas Hammel;

(I)  Keith Lobrono, a private investigator licensed by the State of Louisiana and a citizen and resident of the Parish of Jefferson, State of Louisiana;

(j)  Network Strategist, A Professional Detective Agency licensed by the State of Louisiana and a resident of the Parish of Orleans, State of Louisiana, whose sole member is Keith Lobrono;

(k)  Gilsbar, L.L.C., a Louisiana limited liability company domiciled in the Parish of St. Tammany, State of Louisiana; and

(l)  Continental Casualty Company, Inc., a subsidiary of CNA, a corporation domiciled in Chicago, Illinois.

**IV. FACTUAL ALLEGATIONS**

*A.  THE POOL CASE*

14. Heidi Nuss ("Nuss") and Mark E. Morice ("Morice") are a married couple owning property and residing at 6833 General Diaz Street in the Lakeview Neighborhood of New Orleans, Louisiana (the "General Diaz Property"). The Lakeview Neighborhood of New Orleans is an area the City of New Orleans has designated to receive special community policing.

15. Nuss and Morice consulted Ladner's Industries Co., d/b/a Ladner's Pools (Ladner's Pools) to construct a swimming pool in the backyard at 6833 General Diaz Street for $87,200.[1]

16. Nuss and Morice then issued a series of costly "change orders" that increased the prices of the swimming pool to approximately $110,000, for which Nuss and Morice had paid only a deposit of $7,000. Thereafter, Morice presented Ted Ladner and Ladner's Pools with a "contract" vastly different to the original agreement to build a pool for $87,200, and purportedly signed by a person who was not an employee or member of Ladner's Pools, and who was not permitted or authorized to bind the company. This new agreement was written and entirely typed by Morice without any knowledge by Ted Ladner or Ladner's Pools. On information and belief, Morice misappropriated Ladner's Pools' letterhead from the genuine, original contract to make the second "contract" created by Morice appear as issued by Ladner's Pools. Morice's new "contract" contained a "penalty provision" or "discount" for a deduction of $100.00 a day for every day the pool allegedly remained unfinished after the declared date of scheduled completion.[2] On information and belief, Morice told Ted Ladner and other members of Ladner's Pools that he would sue them if they did not agree to build Nuss and Morice the $110,000 swimming pool at a financial loss to Ladner's, and they could either agree to let them have the more expensive pool at a significant loss to the company, or they could face litigation from Nuss and Morice. Morice told Ladner's associates that because Morice was an attorney, Ladner's Pools would be forced to pay many thousands of dollars to defend itself, and so Ladner's would

---

[1] Mark E. Morice maintains that the General Diaz Street property is the separate property of Heidi Nuss; however, given the lack of proper recordation of any valid prenuptial agreement as a distinct, indexed document in Orleans Parish, and questions arising about the legal validity of other documents, Plaintiffs disputed this issue and raised it as a defense in the Pool Case.

[2] This "penalty" or "discount" provision of "$100 a day" is not found in any of Ladner's Pool's other contracts or proposals, and neither Ted Ladner nor Ladner's Pools would ever agree to such a provision.

choose to incur the loss rather than defend itself.  Ted Ladner and Ladner's Pools refused the modified contract and stopped construction because they had already provided Nuss and Morice with goods, services and labor worth over $24,000.  Nuss and Morice responded by filing a lawsuit, *Heidi Nuss v. Ladner's Industries Corporation, d/b/a Ladner's Pools, Theodore A. "Ted" Ladner, Jr., et al*, No. 2018-11691 in the Civil District court for the Parish of Orleans, State of Louisiana (hereinafter, the "Pool Case").  The Pool Case was the catalyst of all events giving rise to the instant suit.

17. Nuss was named Plaintiff in the Pool Case, and was represented by Morice as a attorney, who then brought in Douglas S. Hammel ("Hammel") and The Hammel Law Firm, LLC as co-counsel.[3]

18. Ted Ladner and Ladner's Pools hired Sarah Whalen ("Whalen") as an attorney to represent them in the Pool Case.

**B. MARK E. MORICE**

19.     Morice is an attorney authorized to practice law in the State of Louisiana.  Morice practices law with the "Morice Law Firm, L.L.C."

20.     On information and belief, Morice is a reserve deputy of the Plaquemines Parish Sheriff's Office (the "PPSO").  On information and belief, Gerald A. Turlich, Jr. ("Turlich"), in his official capacity as Sheriff of Plaquemines Parish in the State of Louisiana, appointed Morice as a reserve deputy, clothed Morice with the indicia of a deputy of the Plaquemines Parish

---

[3] To add pressure to Ted Ladner and Ladner's Pools, Morice and Nuss filed "complaints" against Ted and Ladner's with the Better Business Bureau ("BBB") and the Louisiana State Licensing Board for Contractors ("LSLBC"), offering to settle the matters if Ted and Ladner's agreed to 'honor the contract' and build Nuss and Morice the $110,000 pool for $87,500.  The BBB and LSLBC fully investigated Nuss's and Morice's claims, and found them to be meritless.

Sheriff's Office, and assumed the obligation of training Morice, including the training identified as Peace Officer Standards and Training (POST) from the PPSO.

21.     The PPSO lists Morice as a full-time employee in records filed with the State of Louisiana even though he is not a full-time employee, and, on information and belief, Morice receives no financial compensation from the PPSO.

*C. SARAH WHALEN*

22.     Whalen is an attorney authorized to practice law in the State of Louisiana.

23.     After Morice filed the Nuss lawsuit and in connection with her representation of Ladner's Pools, Whalen drove on public roads and walked on a public sidewalk and alley near the General Diaz Property where the pool was under construction to photograph the back yard pool area and the ditches leading to the front sidewalk, which were at issue in the Pool Case, and which were viewable from public vantage points without obstruction, for proper purposes including the documentation of the failure of Nuss and Morice to mitigate their damages.

24.     Whalen used a small, hand-held camera to photograph the General Diaz Property from the sidewalk and alley.  At no time did Whalen set foot on the General Diaz Property.

25.     On April 24, 2019, after taking these photographs, Whalen drove by the General Diaz Property as she was leaving the neighborhood, and was confronted by Morice, who positioned himself in the street in front of her slowly proceeding vehicle. After entering the street and positioning himself squarely in front of the Whalen vehicle, Morice pointed the palm of his hand towards her as if ordering her to stop as a policeman would do.

26.     From this position, Morice photographed and/or filmed Whalen, who had stopped her vehicle on General Diaz Street so as not to have any physical contact with Morice. She remained inside her vehicle restrained by her seatbelt with the windows rolled up and the doors locked. After recovering from her initial shock, and realizing that she could not leave safely, Whalen took photographs of Morice blocking and moving around her car, filming, photographing and recording her as she sat inside her car on General Diaz Street. She also tried to safely leave by placing her car in reverse but she had to stop after Morice ran and stood behind her car.

27.     After Morice stopped moving around her car in the street and then stepped onto a sidewalk to the left of Whalen's car, Whalen took photos to establish that Morice was safely on the sidewalk away from her car, and she then drove forward, moving her car to a parking space in the 6800 block of Marshal Foch Street (the "Marshall Foch Location"), where she parked her vehicle. Ms. Whalen then spoke on the phone with Ted Ladner. Ms. Whalen also tried to find her asthma medication inhaler because she was unable to breathe normally due to the stress of Morice's behavior on General Diaz Street.

28.     Morice then drove in a car to the Whalen vehicle at the Marshal Foch Location and pulled his car parallel and next to Whalen's car so that Morice's driver's window was adjacent to Whalen's driver's window, deliberately blocking her so that she could not safely pull her car out into the street to drive away. Again, Morice took pictures and/or videos of Whalen sitting in her vehicle. Morice's window was rolled down, and at all times, Whalen's window was rolled up and her car locked. Unable to move her car, Whalen again photographed Morice's actions towards her from her locked car.

29.     At no time did Morice identify himself verbally, nor did he request that Whalen identify herself.  On information and belief, during this encounter at the Marshall Foch Location Morice phoned 911, although he did not inform Whalen nor did he ask her to wait for the police. At the time, Whalen had no idea that the police had been called, and only learned of the 911 call in Morice's subsequent deposition. As soon as Morice moved his vehicle away from Ms. Whalen's vehicle, Whalen safely drove away from the Marshall Foch location..

### D. The 911 Call

30.     On information and belief, on April 24, 2019, at approximately 6:29 p.m., Morice phoned the Emergency '911' phone number to report a "suspicious person" who is "parked on Marshal Foch in front of — in the 6800 block of Marshall Foch."[4]

31.     According to the 911 transcript, Morice reported to the 911 operator a description of the vehicle, including its license plate number. Morice indicated that the person in the vehicle was a white female who appeared to be in her late 50s or 60s.

32.     When asked by the 911 operator if any weapons were involved or mentioned, Morice replied, "No ma'am, not that I'm aware of."  When asked by the 911 operator if he or anyone else was in danger, Morice replied, "I don't believe so." Morice told the 911 operator, "I know there is a Lakeview police officer that we pay out here."

33.     The 911 operator told Morice, "Do not approach the person or the vehicle" and that an officer would be dispatched and to call back immediately if anything changed before the officers arrived.  On information and belief, Morice did not make any further 911 calls that evening.

---

[4] The transcript of Morice's 911 Call is attached as Exhibit 1, Page 2, line 11.

34.    On information and belief, the white female reported by Morice was Whalen.

35.    At no time during his 911 call did Morice accuse Whalen of trying to hit him with her car or committing the crime of attempted murder or vehicular homicide.

### E. THE POLICE RESPONSE

36.    In response to Morice's 911 Call, the New Orleans Police Department (the "NOPD") dispatched Officer Joseph Maher and Officer Roy Shackelford.

37.    NOPD Det. Roger Caillouet ("Det. Caillouet")—who on information and belief was not dispatched to the scene by the N.O.P.D. dispatch – arrived before Officer Maher and Officer Shackelford..

38.    Upon information and belief, Morice contacted Det. Caillouet separately from the 911 communication and requested Caillouet's assistance.

39.    Det. Caillouet arrived before the officers dispatched by the NOPD.

40.    On information and belief, the audio of the video body cameras of Officers Maher and Shackelford was disabled after Officers Maher and Shackleford arrived on the scene.

41.    The Maher and Shackleford recordings show the driver of the police vehicle speaking with someone who, upon information and belief, is Det. Caillouet.

42.    On information and belief, Det. Caillouet advised the dispatched officers that he would handle the matter even though he had not been dispatched to the scene by the NOPD.

43.    After the conversation, the audio recordings of the Maher and Shackleford body worn cameras was recommenced, and the officers Maher and Shackleford drove away.

## F. THE LICENSE PLATE LOOKUP

44.     Morice and Det. Caillouet's discussion regarding the incident caused Det. Caillouet, acting under color of law, to research the license plate of the vehicle described by Morice through the motor vehicle database available to Det. Caillouet as a law enforcement officer (the "License Plate Lookup"). Neither Ms. Whalen nor Mr. Spizer consented to the search for information regarding the license plate by Det. Caillouet or the release of the information by Det. Caillouet to Morice.

45.     Upon information and belief, Morice's status as a reserve deputy of the Plaquemines Parish Sheriff's Office influenced Det. Caillouet to carry out the License Plate Lookup as a favor to a fellow law enforcement officer.

46.     Although Det. Caillouet did not file an incident report, he filed a 'supplemental' report that reveals he conducted the License Plate Lookup for the license plate of the Whalen vehicle described by Morice.  Upon information and belief, Det. Caillouet did his Lookup and filed his report on April 24, 2019.

47.     Det. Caillouet reported that the purpose for the License Plate Lookup provided by Det. Caillouet in the supplemental report was that the Whalen vehicle was involved in a "hit and run" crime.  In fact, no "hit and run" ever occurred.  Det. Caillouet provided this wrong justification with full knowledge of its falsity.

48.     The vehicle registration information obtained by Det. Caillouet from the License Plate Lookup indicated that the vehicle was owned by Whalen and David Bruce Spizer ("Spizer").

## G. DAVID BRUCE SPIZER

49.     Spizer and Whalen are unmarried romantic partners. Spizer purchased the vehicle as a gift for Whalen. His name appears on the title only because he is financing the vehicle. Spizer's designation as a co-owner of the vehicle was the reason Morice instituted legal proceedings against Spizer and accused him of acting in "conspiracy" with Plaintiffs, of stalking, harassing, and intimidating Morice and his family.

50.     Spizer had no involvement in the Pool Case, nor has Spizer ever been in Whalen's vehicle except on a few occasions when Whalen has given Spizer a ride to and from the airport. Neither Ted Ladner nor any member of Ladner's Pools had ever been inside Whalen's car.

## H. THE CITIZEN'S COMPLAINT

51.     On or about May 2, 2019, Whalen called Plaquemines Parish Sheriff's Office ("PPSO") to file a citizen's complaint against Morice, in his capacity as a reserve deputy of PPSO, for his conduct on April 24, 2019, when he used law enforcement gestures to detain her vehicle in the public street outside of the General Diaz Property so that he could walk around her vehicle while photographing and/or filming her, and again, when Morice prevented her from lawfully driving down Marshal Foch Street by blocking in her car with his car. Whalen had also been told by a former Morice associate that Morice had "bragged" about having "run" her car's license plate, an action which Morice and Det. Caillouet knew to be illegal and a violation of Whalen's civil rights.

52.     Whalen spoke with PPSO Detective Ty Wiltz ("Det. Wiltz") and told him she was concerned that Morice had run her car's license plate and obtained private information about her.

She described her encounter with Morice on April 24, 2019. In response to questions by Det. Wiltz, Whalen also described how, while attending a hearing at the Fourth Circuit Court of Appeals on May 1, 2019, Morice had pointed Whalen out to a deputy in the courtroom by gesticulating in a way that made all spectators and attorneys stare at Ms. Whalen, and, on information and belief, then Morice showed the deputy the photographs he had taken of Whalen on April 24, 2019. On information and belief, Morice intended his actions to place Whalen in fear of her personal safety. Morice's behavior made Whalen fearful of Morice, and also fearful that he was trying to persuade the deputy to arrest her and/or remove her from the courtroom.

53.     In further response to questioning by Det. Wiltz, Whalen explained that she had recently learned that Morice had admitted, during a deposition in his lawsuit against the City of Gretna, to having "about five" criminal arrests and summonses, the records of which Morice claimed had been expunged.[5] Ms. Whalen also learned that Morice claimed that he owned a gun. Ms. Whalen learned also that Morice made remarks about his own "crazy" mental state and reputation for acting "crazy."[6] Whalen told Det. Wiltz that she was increasingly concerned for her personal safety and the safety of her fellow citizens, and that she wished to make a Citizen's Complaint.

54.     Det. Wiltz assured Whalen that he would investigate the matter. Upon information and belief, Det. Wiltz and the PPSO recorded Wiltz's conversation with Whalen.

---

[5] *Mark Morice and Heidi Morice v. City of Gretna*, No. 2:12 cv 01156, consolidated with 2:14 cv 0122, U.S. District Court for the Eastern District of Louisiana, July 21, 2015, at pages 79-82. In conducting discovery in the Pool Case, Plaintiffs found other public records that referenced some of these arrests and summonses.

[6] *Mark Morice and Heidi Morice v. City of Gretna*, No. 2:12 cv 01156, consolidated with 2:14 cv 0122, U.S. District Court for the Eastern District of Louisiana, Deposition of Mark E. Morice, July 21, 2015, at pages 53-60.

55.     Upon information and belief, Det. Wiltz, acting under color of state and local law in his official capacity as a detective with the PPSO, discussed Whalen's call with Morice.

56.     Further, upon information and belief, Det. Wiltz or another employee of PPSO, acting under color of state and local law, gave Morice access to and/or a copy of the recording of Whalen's telephone conversation with Det. Wiltz.  There is no legal basis or other justification supporting Det. Wiltz's disclosure of his full conversation with Whalen, including but not limited to her genuine fears for her safety.  On information and belief, Det. Wiltz and/or the PPSO colluded with Morice in an effort to prevent and to obstruct an honest, full and genuine investigation into Whalen's citizen complaint.  Upon information and belief, Det. Wiltz knew that Morice planned to file the petition for the temporary restraining order and preliminary injunction against Plaintiffs, and gave Morice information that assisted Morice in filing his petition for the TRO and preliminary injunction.

57.     Whalen has not been provided with a recording or transcript of her telephone conversation with Det. Wiltz despite the issuance of a subpoena to the PPSO by Whalen's attorneys.  The PPSO continues to protect its employee, Morice, from the consequences of his alleged wrongdoing.

## H.  THE MORICE "MOTION" FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF.

58.     On May 3, 2020, Morice filed a "Motion" for Temporary Restraining Order and Preliminary Injunction in *Mark E. Morice v. Sarah Whalen a.k.a. Sarah Rumage and David Bruce Spizer and Ladner's Industries Corp d/b/a Ladner's Pools and Theodore A. "Ted" Ladner, Jr., et al*, No. 19-4676, Civil District Court for the Parish of Orleans (May 3, 2019) (the

"Morice T.R.O. Motion"). (Exhibit 2) The pleading is signed by Morice and is filed by Morice and the Morice Law Firm, L.L.C..

59.    Morice filed the Morice T.R.O Motion against the following parties:

(1) Whalen; (2) Spizer; (3) Ladner's Pools; and (4) Ted Ladner.

60.    The Morice T.R.O. Motion specifically identifies each of the Plaintiffs by name, and falsely accuses them of engaging in a pattern of stalking, harassing, and intimidating Morice and his family over a period of months prior to May 3, 2019.

61.    The Morice T.R.O. Motion further falsely attributes conduct to Spizer and Plaintiffs both individually and jointly. The petition contains numerous false and defamatory statements made against Whalen, Spizer, Ted Ladner and Ladner's Pools as named "defendants," including but not limited to the following:

A.    In Paragraph 5, Morice falsely states: "Defendants have multiple vehicles they have been using to stalk, harass and intimidate plaintiff [Morice].

B.    In Paragraph 10, Morice falsely states: "Defendants blocked Mr. Morice in for several minutes while taunting and threatening him."

C.    In Paragraph 17, Morice falsely claims: "Defendants may be attempting to enter his home from the rear yard."

D.    In Paragraph 18, Morice falsely states: "Defendants continued to stalk, harass and intimidate Mr. Morice by continuing to stay outside of his residence on the next block over."

E.    In Paragraph 37, Morice falsely states: "Defendants have been driving by and/or waiting outside of Mr. Morice's residence for Mr. Morice's wife to exit the house with their children so that Defendants can personally harm Mr. Morice and his wife and children."

As to Whalen, these false statements mischaracterize her conducting reasonable and legitimate discovery in public as stalking, harassment and intimidation. As to Ted Ladner and Ladner's Pools, they are total fabrications as they were not even in the vicinity of Morice's residence during the alleged incidents of stalking.

62.    In Paragraph 29 of the Morice T.R.O. Motion, Morice falsely claims that Plaintiffs "have a financial motivation to continue to stalk, harass, intimidate and harm Mr. Morice and his family members as they are attempting to influence Mr. Morice to drop a lawsuit against Ladner's Pools." Morice makes similar untrue claims that Plaintiffs are financially motivated in Paragraphs 32, 33, 38, and 39. Morice's 'motion" for the TRO also falsely states that Plaintiffs have caused Morice to fear for "his life and the life of his wife and his two minor children because of the documented actions of Defendants" and he "believes that he and his family's life, safety and health are all in danger by the conspiring defendants" (Paragraphs 34, 40 and 42.)

63.    The Morice T.R.O. "Motion" contains numerous false and defamatory statements made against Whalen individually, pertaining to Morice's encounter with her on April 24, 2019, including the following:

A.    In Paragraph 3, Morice falsely claims Whalen was "in front of Attorney Mark Morice's home and stalking him and his family taking photographs with a zoom lens into the house."

B.    In Paragraphs 6 and 9, Morice falsely claims that Whalen drove and parked her vehicle in the middle of the street to trap Morice so that he could not drive away.

C.    In Paragraph 12, Morice falsely states "Whalen suddenly and without warning accelerated at a high rate of speed away from the Morice residence but the stalking, harassing and intimidating did not end here."

D.    In paragraph 14, Morice falsely claims that "the combination of Ms. Whalen's taunting him, her actions, erratic facial expressions and the wild look in her eyes told him that her threat to him and his family was not over."

E.    In paragraph 15, he falsely states that "Whalen continued stalking Mr. Morice and his family and was now parked in her vehicle less than a block away from Mr. Morice's residence."

These false statements contained in the state court pleadings are inconsistent with Morice's comments to the 911 operator as detailed in above.

64.    The Morice "motion" for the TRO and preliminary injunction contains other false and defamatory statements made against Whalen individually, including the Morice's false claim in Paragraph 27 that "Whalen followed Mr. Mark Morice to the Fourth Circuit Court of Appeals to stalk, harass and intimidate him." In Paragraph 31, Morice falsely claims that "Sarah Whalen

and Bruce Spizer began their pattern of stalking, harassing and intimidating Mr. Morice and his family" when she signed on as attorney for Ted Ladner and Ladner's Pools.

65. The Morice "motion" for the TRO and preliminary injunction further contains false and defamatory statements aimed at damaging Whalen's professional reputation as an attorney, and impugning her mental fitness to practice law. In Paragraph 35, Morice falsely states that "Whalen and/or her clients have been sanctioned in 100% of her cases in Jefferson Parish over the past 6 years." In Paragraph 36, he falsely claims "Whalen has been called to answer for dozens of lies, false representations to the Courts, false representations to opposing counsels, false 'quotations' that no one ever said, false certificates of service, false allegations of evidence that never existed, failure to send opposing counsel documents, failure to follow court orders, failure to adhere to rules of procedure and the list goes on and on." Morice makes similar false claims in Paragraph 41 of the "motion" for the TRO and preliminary injunction.

66. Although Morice did not allege that Whalen attempted to run him over with her vehicle in the Morice "motion" for the TRO and preliminary injunction or make any such statement in the 911 Call, he later filed verified pleadings falsely stating that on April 24, 2019, Whalen attempted to run him over with her car as he moved around her halted car. Morice has alleged that this violent crime is not merely a crime by Whalen, but is part of a conspiracy conducted on behalf of Ted Ladner and Ladner's Pools, as well as Spizer, to gain financial advantage in the Pool Case, among other alleged aims. Morice has repeated these false accusations of attempted vehicular homicide in out-of-court statements, in depositions, before the judge in the Morice "motion" for the TRO and preliminary injunction, and in the Pool Case, in out-of-court meetings before Special Master Michael Bagneris, in other communications which are not privileged, and to other third persons. This constitutes defamation per se.

67.    Morice made these false and defamatory statements regarding attempted vehicular homicide against Plaintiffs without having any personal knowledge except as to Whalen being on public property adjacent to the General Diaz Property and her attending a public hearing at the Fourth Circuit Court of Appeals—all of which are legal and permissible behaviors. None of the aforesaid allegations in Morice's "motion" for the TRO and preliminary injunction, nor his claim that Whalen attempted to murder him with her car, can be considered to have been based upon reasonable belief.  Thus, Morice's allegations were made in a negligent and reckless manner with malice towards Plaintiffs.

68.    By making his false and defamatory statements concerning Plaintiffs in pleadings filed into the public record, Morice has made unprivileged publications to multiple third parties. Morice cannot argue that he was making these statements in his capacity as an attorney in good faith based on privileged information supplied to him by his client as he is representing himself, the statements are made maliciously, and the statements are indeed his own and not merely those of a client.

69.    Upon information and belief, Morice relied upon the information provided to him by Det. Caillouet and Det. Wiltz to prepare the Morice  "motion" for the TRO and preliminary injunction , which alleged that Whalen spent one hour on the phone with the PPSO "falsely accusing Mr. Morice of scandalous and criminal activity."[7]

70.    Upon information and belief, Morice used this information in his legal action against Plaintiffs and Spizer, and violated their civil rights.

---

[7] *See* Paragraphs 23-25 of the Morice T.R.O., Exhibit 2.

71.     Upon information and belief, Morice would not have filed the Morice "motion" for the TRO and preliminary injunction but for his improper access to (1) the "License Plate Lookup," obtained improperly and under knowingly false pretenses by Det. Caillouet; and (2) the recording of Whalen's citizen's complaint, which was improperly disclosed by Det. Wiltz as a "professional courtesy" to a fellow employee of the PPSO.

## I. MORICE'S FAILURE TO GIVE EFFECTIVE NOTICE OF THE MORICE T.R.O.

72.     Only after the filing of the Morice  "motion" for the TRO and preliminary injunction, Morice transmitted or caused to be transmitted to the attention of Whalen a cover sheet for the copy of the  "motion" for the TRO and preliminary injunction to the fax machine located in Spizer's law office.  Whalen was not at Spizer's office at the time Morice's fax was received; it had had a cover page indicating that "Max Chotto" was sending a "motion" for the TRO and preliminary injunction that was "to be filed."

73.     Upon seeing the fax on his office fax machine, Spizer called Morice's office twice, each time leaving an urgent message asking Morice to call him in hope of preventing the Morice "motion" for the TRO and preliminary injunction from being filed as Spizer was not then aware that Morice had already filed the petition for the T.R.O. "Motion" in the Clerk's office of the Civil District Court. Nevertheless, and contrary to Louisiana law, Morice, with knowledge that Spizer had called his office twice and asked that Morice call him, presented his "motion" for the TRO and preliminary injunction to the Duty Judge over Spizer's objections.

74.     Despite knowing Whalen's telephone number and email address, and Ted Ladner's and Ladner's Pools' telephone numbers, fax machine numbers, and email addresses, Morice failed to phone  Plaintiffs to inform them that he was filing for a TRO.  Whalen was not

in Spizer's office at the time when the "motion" for the TRO and preliminary injunction arrived by fax.

75.     Under the circumstances that existed at the time of filing the "motion" for the TRO and preliminary injunction, the Louisiana Code of Civil Procedure and other relevant law requires that notice and an opportunity to be heard be given to parties prior to the filing of the "motion" for the TRO and preliminary injunction unless applicant's attorney certifies in writing as to the efforts which have been made to give notice or the reasons supporting the claim that notice should not be required,.[8]

76.     Morice represented to the Court in the affidavit in support of the "motion" for the TRO and preliminary injunction that Morice "have faxed" a copy of the document to plaintiffs. The time stamps on the court filing and the fax cover sheet confirm that Morice did not send the fax cover sheet prior to filing the "Motion" for the TRO with the Clerk of Court. Morice failed to give Plaintiffs proper notice prior to the filing., and misrepresented otherwise to the court.

77.     On information and belief, Had Morice told the Duty Judge of Spizer's objections (as phoned in to Morice's office), Spizer's attempts to discuss the T.R.O. with Morice, and Morice's failure and refusal to phone Whalen and Spizer, as well as Morice's failure to notify Plaintiffs prior to the filing, the Duty Judge would have given Spizer a hearing on the matter and, upon learning that Spizer did not even know Morice or where Morice lived or worked, and the falsity of the allegations, would have refused to sign the Order for the T.R.O.  The fact that Morice failed to give Plaintiffs any effective notice of the T.R.O. would also have resulted in the Duty Judge refraining from signing the Morice T.R.O. Order.

---

[8] *See* La. Code Civ. P. art. 3603(a)(2).

78.     On May 6, 2019, the Civil District Court for the Parish of Orleans, State of Louisiana issued "Restraining Order" against all named defendants restraining, enjoining and prohibiting Whalen, Ted Ladner. Nad Ladner's from "stalking, harassing, intimidating or causing or attempting to cause any and/or performing any abusive acts aimed at harassing petitioner [Morice], petitioner's guests and his employees at his residence or his contractor's workplace or at his children's school for any reason whatsoever...."[9]

79.     Morice's deliberate failure to inform the Court, in an ex parte hearing, of material facts known to him that would have enabled the tribunal to make an informed decision led to the unjust result of the Duty Judge signing an Order that a TRO be issued against Plaintiffs and Spizer.

## J. ACTIONS BY HAMMEL

80.     On May 9, 2019, Whalen and Spizer filed their responsive pleadings, separately, to the Morice T.R.O. Motion, which included Spizer's sworn Affidavit and Whalen's representations in pleadings in which they, each and separately, under oath, denied the allegations brought against them by Morice.[10]

81.     Rather than evaluate this information and act accordingly, Morice's response was to make more unfounded accusations against the Plaintiffs and Spizer.

82.     At a May 10, 2019 hearing on the "motion" for the TRO and preliminary injunction, Douglas S. Hammel ("Hammel"), an attorney licensed to practice law in the State of

---

[9] *See* TRO Order of May 6, 2019, Exhibit 3.

[10] *See* Affidavit of Spizer attached as Exhibits 4.

Louisiana (who attended the hearing solely in a representative capacity as counsel for Nuss in the Pool Case)[11], further disseminate and expand false representations made by Morice.

83.     Hammel proceeded to: (a) mischaracterize Spizer as a bankruptcy attorney (a cursory investigation would have revealed this to be untrue); (b) represented that Spizer was "feeding" IRS documents to Whalen for the benefit of Plaintiffs and dissemination into the public record;[12] © declared that "[Morice] fears for himself.  He has no idea who this person is and what they have been doing is completely unprofessional and irresponsible.  That's the purpose of why the TRO was filed both against Mr. Spizer—this is the best part, Judge, he did get notice."[13]

84.     Hammel's false statements about Spizer, Whalen and the other Plaintiffs are not privileged as they were made in open court by Hammel with malice, who was not representing Morice in the Morice TRO action.   Rather Morice—who again, is an attorney—represented himself in that proceeding.[14]   Thus, neither Hammel nor his law firm should be afforded any protections that an attorney might have in making statements based on false representations of his client.   Hammel made other allegations regarding Whalen's conduct without having any personal knowledge.[15]

---

[11] *See* Exhibit 5, transcript of the May 10, 2019 hearing, Page 1, lines 3-5 and 12-13.

[12] See Exhibit 5, Page 13, lines 9-14

[13] *See* Exhibit 5, Page 13, lines 23-28.

[14] *See* Exhibit 5, at page 19, lines 4-11.

[15] See Exhibit 5, pages 11 – 12.

### K. MORICE'S RULE FOR SANCTIONS AND CONTEMPT.

85.     On May 16, 2019, Morice filed a "Rule for Sanctions and Finding of Contempt" against Whalen, in which he falsely accused Whalen and Spizer of violating the Morice T.R.O., being in contempt of Court, and intentionally misleading the Court.  Morice also claimed that Whalen had violated the Morice T.R.O. by returning telephone calls made to her by the PPSO's Internal Affairs Office's Det. Ty Wiltz (telling him to call her attorney).  These calls had been received by Whalen prior to the issuance of the Morice T.R.O.; moreover, the T.R.O. had not been served upon Whalen, Ted Ladner, Ladner's Pools, or even Spizer.  Morice's statements to the Court were another string of knowing falsehoods he made to the Civil District Court with actual malice as part of his vendetta against Plaintiffs and Spizer.

### L. MORICE'S OPPOSITION TO EXCEPTIONS TO DISSOLVE TRO AND FOR SANCTIONS.

86.     On May 22, 2019, Morice filed pleadings against Whalen entitled "Opposition to Exceptions to Dissolve Restraining Order and for Sanctions" (the "Morice Opposition") in which Morice made additional false and defamatory statements against Whalen, and also against Plaintiffs and Spizer by reiterating each of his false claims as presented in his previous  "motion" for the TRO and preliminary injunction against Plaintiffs and Spizer.

> (A)     In page 9, paragraph 3 of his "Opposition," Morice claims again that "defendants have worked together to harass, intimidate and cause emotional harm to Plaintiff and his family," and that Whalen "contacted Plaintiff's workplace [the PPSO], in direct violation of…the TRO."

(B)  In page 10, paragraph 1, Morice makes the false claim that Ted Ladner and Ladner's Industries Co. "entered" a pool construction "contract" allegedly providing "stipulated damages of $100 per day for every day that the pool was not completed after the passage of six weeks" due to the alleged "poor health of Ms. Nuss."[16]

(c)  In page 10, paragraph 2, Morice falsely claims that "Defendants are doing everything in their power to harass, intimidate and interfere with the pool building process."  Morice further falsely claims "Defendant Whalen lies to the Court...in her pleadings, just as she denies any and all wrongdoing."

(D)  In page 10, paragraph 3, Morice further falsely says that "Defendant Whalen has contacted Plaintiff'[sic] neighbors and made salacious, hateful, harmful and harassing comments." Morice further falsely claimed that Whalen "is known in the legal community as exhibiting wild, erratic behavior and making up conspiracy stories with lies and false quotations attributed to opposing parties and counsel alike."

(E)  In page 13 paragraph 3, Morice further falsely alleged that Whalen has a "propensity for erratic and unpredictable behavior coupled with a history of lying to courts and opposing counsel throughout multiple jurisdictions."

---

[16] Plaintiffs make no claim to any independent knowledge of Nuss's health, except to say that Morice often makes statements, oral and in pleadings, about what he says is his wife's health condition.

(F)   On page 29 of his Opposition, titled "Affidavit and Certification," Morice falsely stated that "on April 24, 2019...when I walked to the rear of Defendant Sarah Whalen and Defendant David Spizer's car, Defendant Sarah Whalen put the automobile in reverse and tried to hit me with the car."[17]   Although Morice included his Affidavit as an exhibit and it is time-stamped by the Court with his Opposition, Morice in fact failed to sign his "affidavit and certification" and failed to have it notarized as required by law.  Morice's "Affidavit" is attached as Exhibit 10.

(G)   Morice further defamed Plaintiffs by falsely stating that: "Defendants have intentionally and repeatedly followed or harassed [Morice] and caused him to feel alarmed and emotional distress...as a result of verbal, written, or behaviorally implied threats of death, bodily injury, kidnaping, and other statutory criminal acts to himself and members of his family." [18]

87.   Morice failed to mitigate the damages by admitting he was wrong and by immediately dismissing all the plaintiffs.

---

[17] Whalen did try to drive away after Morice blocked her car in the street and filmed her, but he was standing in front of her car so she attempted to leave by backing up; however, Morice then ran behind her car, so she had to stop.  At no time during his 911 call on April 24, 2019 did Morice make any claim that Whalen attempted to run him over with her car.  Morice's false charge of attempted vehicular homicide against Whalen is an especially offensive and egregious false statement which caused Whalen to suffer extreme emotional distress.

[18]  It should be noted that Morice took this language nearly verbatim from the Louisiana criminal statute on stalking, LA Rev Stat § 14:40.2, and there is not one fact to support Morice's claims.  Morice used the stalking statue as his starting point and then fabricated defamatory statements against Plaintiffs and Spizer to match the statute in a vain effort to prove that the TRO defendants had stalked him.

### M. MORICE'S COMMUNICATION OF TRO AND FALSE ACCUSATIONS TO PARKER KORNICK CONSTITUTES DEFAMATION PER SE AND EXTREME MALICE

88.     On May 4, 2019, Mark Morice sent an unsolicited email to Parker Kornick, an attorney unrelated to any matter concerning Plaintiffs and Spizer, with an attachment of the Morice "motion" for the TRO and preliminary injunction. In this email, Morice falsely stated:

> "My family and I have been stalked by several people associated with Ladner's Pools, but this email is directed towards specific information regarding an attorney named (Sarah Whalen) who was hired by Ladner's Pools to defend the case filed by my wife for breach of contract.  Sarah Whalen and/or her clients have been sanctioned by several judges in 100% of her cases over the past 6 years in the 24th JDC and has many instances of outrageous conduct in Orleans Parish."

At all relevant times, Morice knew, or had reason to know, that his written statements to Kornick about Plaintiffs were false.

89.     Morice's email of May 4, 2019 to Parker Kornick further falsely alleged: "My investigation into her [Whalen's] erratic behavior is ongoing, but I am in legitimate fear for my welfare, health and that of my family. I have obtained a TRO against Sarah Whalen and I attach it for your reference. The Permanent Injunction hearing is on May 15th." Plaintiffs suffered from Morice's wrongful and pointless publication of his written defamation to a third person not at all involved in any matter, nor representing any party.  In doing so, Morice acted with malice. The request for the TRO and the request for a preliminary injunction have been dismissed by the state court.

### N.     MORICE AND OTHER DEFENDANTS ENGAGED IN IMPROPER AND HARASSING SURVEILLANCE OF PLAINTIFFS

90.     On information and belief, Morice directed and coordinated his agents, including

Keith Lobrano ("Lobrano") and Network Strategist" to illegally and maliciously place Whalen

under intrusive, harassing, intimidating, and unnecessary surveillance, including but not limited

to: audio and film recordings; illegally "running" of car license plates and other records;

following Whalen to and from her work and meetings with her attorneys; recording her

conversations with clients (including but not limited to Ted Ladner, members of Ladner's Pools,

and witnesses in the Pool Case and the Morice case for the "motion" for the TRO and

preliminary injunction, and others; filming her as she drove her car down public streets; driving

around her vehicle in a reckless and frightening manner; following Whalen to and from her

doctor's appointments, including Touro Hospital (where she is a cancer patient in treatment),[19] to

and from her residence; to and from her in coffee shops and other places where neither Morice

nor any named defendant in this action had any cause or reason to be. These actions took place

from approximately August 24, 2019 to mid-January 2020, causing Whalen to suffer extreme

emotional distress, and wrongful interference with her personal, professional and business life.

Upon information and belief, all or some of the following Defendants coordinated, directed

and/or participated in this surveillance: Morice; Morice Law Firm, LLC; Ty Wiltz; the PPSO;

Gerald A. Turlich, Jr.; Det. Roger Caillouet; the NOPD; Keith Lobrono; and Network Strategist.

---

[19] *See* Exhibit  , Touro Infirmary Progress Notes, 6/21/2019, in which Whalen, in response to her
oncology physician's questions about her health, reluctantly said that Morice and Defendants
had been following her and terrifying her.  Whalen's psychological and physical health were so
adversely impacted that Touro called the NOPD, and stated that they would not allow Whalen to
leave the hospital until she spoke with the police.  Whalen complied; shortly thereafter, Morice
was informed of Whalen's conversation with the NOPD officer called to Touro; Morice then
filed a Motion for Contempt against Whalen in the Morice T.R.O. Motion claiming that Whalen
was "in contempt of court" because her doctor called the police to report his and Defendants'
conduct, and because her doctor ordered her to speak to the police.

91.     Morice and Morice Law Firm, LLC wrongfully placed Plaintiffs under further intrusive, harassing, intimidating, improper and unnecessary surveillance by independently recording, by both sound and video, each and every deposition taken in the TRO case, with cell phones, computers and/or other devices. These recordings were made independent and apart from the licensed deposition stenographer, without prior disclosure in the notice of deposition and without leave of court, despite that each person so deposed and attorneys for Plaintiffs and Bruce Spizer objected to being so recorded by Defendants.  This resulted in an abuse of process against Plaintiffs, and caused Plaintiffs damage and injury.

92.     Upon information and belief, Morice continued to record Plaintiffs, witnesses, witnesses' attorneys, and all non-Defendant attorneys during deposition breaks, during lunch, while the TRO defendants and witnesses were talking with their attorneys in the hallways, and whenever the witnesses, attorneys, and or parties went "off the record."

**V. LAW AND ARGUMENT**

*A. COUNT 1: VIOLATIONS OF 42 U.S.C. SECTION 1983*

93.     "To state a claim for relief in an action brought under § 1983, respondents must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." [20]

---

[20]

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50, 119 S. Ct. 977, 985, 143 L. Ed. 2d 130 (1999).

94.     Plaintiffs were deprived of the protections guaranteed to them under the Constitution and the laws of the United States by Det. Caillouet and Det. Wiltz, both of whom were acting under the color of state and local law.

95.     Det. Caillouet violated Whalen's privacy and due process rights by obtaining the License Plate Lookup under knowingly false pretenses, and further, by providing that information to Morice.   Det. Wiltz violated Whalen's privacy and due process rights by transmitting to Morice information about Whalen's citizen complaint and a recording of his conversation with Whalen that was ultimately used by Morice to manufacture baseless claims and suits against Plaintiffs.

## B.    COUNT 2: VIOLATIONS OF 18 U.S.C. § 2721 – DRIVER'S PRIVACY PROTECTION ACT

96.     18 U.S.C. § 2721 prohibits the disclosure and redisclosure of personal information, including name and address, as retrieved from the State motor vehicle records except for a certain list of in enumerated "permissible uses."

97.     Furthermore, 18 U.S.C. § 2722, declares that: (a) "It shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title"; and (b) "It shall be unlawful for any person to make false representation to obtain any personal information from an individual's motor vehicle record."

98.     Det. Caillouet violated: (a) 18 U.S.C. § 2721(c) by redisclosing the information derived from the License Plate Lookup to Morice; (b) 18 U.S.C. § 2722(a) by conducting the

License Plate Lookup in the absence of a permissible use; and (c) 18 U.S.C. § 2722(b) by falsely representing that a "hit and run" had occurred to justify the License Plate Lookup.

99.     Morice violated 18 U.S.C. § 2722(a) and (b) by obtaining and using the information derived from the License Plate Lookup in the absence of a permissible use, and by making a false representation.

100.    Det. Caillouet's statement that the vehicle was involved in a "hit and run" was a false representation because he knew that the vehicle was not involved in a "hit and run." Neither Det. Caillouet, nor any other law enforcement officer investigated or took any other action with respect to this fictitious "hit and run."

101.    Further, Morice knew that the vehicle was not involved in a "hit and run." He never reported a "hit and run" to the 911 operator, never mentioned a "hit and run" in any of the numerous pleadings he filed against Whalen, Spizer, Ted Ladner and Ladner's Pools in the original T.R.O. action, and never mentioned a "hit and run" in his deposition taken in the Morice T.R.O. action.

102.    By making the false representation of a non-existent "hit and run" to obtain the personal information from Whalen and Spizer's motor vehicle record, Morice and Det. Caillouet violated 18 U.S.C. § 2722(b), which provides that "It shall be unlawful for any person to make false representation to obtain any personal information from an individual's motor vehicle record." The making of the false representation that the motor vehicle was involved in a "hit and run" and entering such knowingly false information into the NOPD computer and databases to obtain personal information from a motor vehicle record and then entering such known-to-be-

false information into a police report was a willful and reckless disregard of the law on the part of Det. Caillouet and Morice.

103. "A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court." 18 U.S.C. § 2724. Accordingly, Plaintiffs now bring this civil action.

## C. COUNT 3: DEFAMATION

104. Morice falsely accused Plaintiffs of criminal conduct and published these falsehoods to the public at large.

105. These baseless allegations made and disseminated by Morice are severely injurious to Plaintiffs' reputations as citizens of New Orleans and (in Whalen's case) as an attorney sworn to uphold the law.

Under Louisiana law, there are four elements necessary to establish a claim for defamation:

(a)   "a false and defamatory statement concerning another;"

(b)   "an unprivileged publication to a third party;"

(c)   "fault (negligence or greater) on the part of the publisher;" and

(d)   "resulting injury."[21]

---

[21] *Kennedy v. Sheriff of E. Baton Rouge*, 05-1418 (La. 7/10/06), 935 So. 2d 669, 674.

106.   "In Louisiana, defamatory words have traditionally been divided into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning."[22]

107.   "Words which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, even without considering extrinsic facts or surrounding circumstances, are considered defamatory per se."[23]

108.   "When a plaintiff proves publication of words that are defamatory per se, falsity and malice (or fault) are presumed, but may be rebutted by the defendant. Injury may also be presumed."[24]

109.   Morice's statements included that Plaintiffs engaged in a "pattern of stalking, harassing and intimidating Morice and his family," which is defamatory per se as it expressly accuses Plaintiffs of the crime of stalking and by its very nature injures Plaintiffs' personal and professional reputations.

110.   Because Morice's statement was defamatory *per se*, falsity, malice, and injury are presumed.

111.   By making his false and defamatory statements concerning Plaintiffs in pleadings filed into the public record, Morice has made unprivileged publications to multiple third parties.[25]

---

[22] *Id.* at 674-75; *Costello v. Hardy*, 03-1146 (La. 1/21/04), 864 So. 2d 129, 140.

[23] *Costello v. Hardy, supra*, 864 So. 2d at 140.

[24] *Kennedy v. Sheriff of E. Baton Rouge, supra*, 935 So. 2d at 675.

[25] *See Costello v. Hardy, supra*, 864 So. 2d at 146.

112.    By sending emails to persons not parties, nor counsel of record, nor involved in the Morice T.R.O., that contain false allegations of criminal wrongdoing, and include a copy of the Morice T.R.O. (including but not limited to the Morice communications to Parker Korneck), Morice has made unprivileged publications to multiple third parties.

113.    Morice's false statements have irreparably damaged Plaintiffs' reputations as upstanding citizens, business persons and business, and in Whalen's case, a licensed attorney.

114.    These statements have jeopardized Plaintiffs' ability to garner the trust of their clients, and have thereby jeopardized their livelihoods.

115.    Further, these false statements are obstacles to any public office or position to which Plaintiffs may aspire.

116.    Plaintiffs have incurred significant expenses in defending themselves against these false and baseless claims.

**D. COUNT FOUR: ABUSE OF PROCESS**

117.    Morice willfully abused the legal process by seeking and obtaining a TRO against Plaintiffs and Spizer for an ulterior purpose.

118.    Specifically, Morice sought a TRO against Plaintiffs and Spizer purportedly to protect Morice and his family from stalking, harassment and intimidation, when, in fact, no such conduct was occurring or even threatened.

119.    Because no such conduct was occurring or threatened, Morice was motivated by ulterior purposes, including, but not limited to:

(a)      to oppress, damage, humiliate, vex, and/or spite Plaintiffs and Spizer;

(b)      to procure leverage or an advantage in the Pool Case;

(c)      to punish any and all parties that Morice believed may have been responsible for Ladner's refusal to build Morice and Nuss a $110,000 swimming pool for a greatly-reduced price;

(d)      to obtain revenge against any and all parties responsible for uncovering public records indicating that Morice and Nuss had IRS liens in excess of $1.12 million dollars for unpaid income taxes, and as a result, they could not afford a pool costing $110,000; and

(e)      to punish any and all parties for bringing, and refusing to withdraw, evidence offered in the Pool Case.

120.    Morice, motivated by a perceived wrong, chose to wield a legal shield as a sword. Morice sought and obtained a result that was not proper under the law and, as a learned attorney, did so knowingly. He maliciously misused and misapplied this process.

121.    To this end, Morice, under false pretenses, improperly obtained information from the NOPD and PPSO and Caillouet and Wiltz, who were aware of and complicit in Morice's ulterior purposes. Further, Morice procured the false representations to the Court by Hammel, who knowingly gave the same.

122.    Plaintiffs and Spizer were severely injured by Morice's abuse of process, financially and emotionally. Plaintiffs and Spizer were forced to defend themselves against this abuse of process and incur legal fees, divert resources from their own businesses, and endure the accompanying trauma.

**E. COUNT FIVE: ABUSE OF RIGHT**

123.    Morice committed an abuse of right when he carried out the above-identified conduct including, but not limited to, seeking and obtaining the Morice TRO, calling 911 emergency services, seeking contempt of court against Whalen and Spizer, and acquiring

information and the recording of Whalen's citizen's complaint to the PPSO. In taking these actions:

    (a)    his predominant motive for the exercise of these rights was to cause harm;

    (b)    there was no serious or legitimate motive for the exercise of these rights;

    (c)    the exercise of these rights violated moral rules, good faith, and elementary fairness; and

    (d)    the exercise of the rights was for a purpose other than for which they were granted.

124.    Upon information and belief, and as described above, the Defendants other than Morice knowingly assisted the exaction of Morice's retribution against Plaintiffs and Spizer.

125.    Accordingly, the Defendants other than Morice are liable for the abuse of right against Plaintiffs by Morice in relative shares to be determined in accordance with either: (a) comparative fault under La. Civ. Code art. 2323; or (b) as solidary or joint tortfeasors under La. Civ. Code art. 2324.

## F. COUNT SIX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

126.    Morice committed Intentional Infliction of Emotional Distress ("IIED") against Plaintiffs and Spizer by seeking and obtaining a temporary restraining order against them on false and defamatory grounds and by continuing to pursue and promulgate these claims in the public arena despite knowing they were false.

127.    Morice's above-described conduct, including, but not limited to, his lodging of patently false and defamatory criminal allegations to pursue a temporary restraining order, seeking enforcement of that temporary restraining order, seeking contempt for fabricated violations of that temporary restraining order, was **extreme and outrageous**.

128.    Plaintiffs and Spizer have suffered and will continue to suffer severe emotional distress from these groundless assaults on their character.

129.    At the very least, Morice, as a learned and licensed attorney, **knew** that it was likely or certain that Plaintiffs and Spizer would suffer emotional distress as a result of his conduct. However, as demonstrated by Morice's pattern of behavior, it is apparent that Morice intended for Plaintiffs and Spizer to suffer severe emotional distress.

130.    Upon information and belief, and as described above, Defendants other than Morice knowingly assisted the exaction of Morice's retribution against Plaintiffs and Spizer.

131.    Accordingly, Morice, Det. Calliouet, Det. Wiltz, and Hammel, are liable for the IIED against Spizer in relative shares to be determined in accordance with either: (a) comparative fault under La. Civ. Code art. 2323; or (b) as solidary or joint tortfeasors under La. Civ. Code art. 2324.

## G. COUNT SEVEN: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

132.    The wrongful actions and false statements negligently made by Morice and Hammel as described in the foregoing paragraphs caused Whalen and Ted Ladner to suffer extreme emotional distress, and Whalen to suffer physical distress.   Their distress was compounded when Plaintiffs learned that Det. Ty Wiltz, the PPSO, Det. Roger Caillouet, and the NOPD negligently had participated and assisted Morice by providing him with private information that should have remained confidential for the safety of Whalen and Ladner. The afore-described negligent surveillance of Plaintiffs by all defendants (except Hammel) also caused Whalen and Ladner to suffer emotional distress.

## H. COUNT EIGHT: MALICIOUS PROSECUTION

133.    Morice committed the tort of malicious prosecution by seeking a temporary restraining order against Plaintiffs and Spizer without probable cause, pursuing its enforcement, and zealously maintaining the action before seeking its dismissal.

134.    Plaintiffs and Spizer incurred significant financial and emotional injuries as a result of Morice's actions including, but not limited to, damage to his reputation, expenses incurred as a result of his defense, lost business opportunities, and psychological trauma.

135.    Plaintiffs' claim for abuse of process is not premature and has fully ripened. Morice attempted to file a First Supplemental and Amended Petition. The District Court struck from the pleading any reference to a request for a Temporary Restraining Order and Preliminary Injunction. Morice's claims for the TRO and Preliminary Injunction have been dismissed by the Court.

## I. COUNT NINE: GENERAL TORT LIABILITY

136.    Under Louisiana law, the fountainhead of tort liability is La. Civ. Code art. 2315, which provides "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

137.    Plaintiffs and Spizer have been damaged by the Defendants' tortious conduct hereinabove described.

138.    In addition to the above Counts, each of the Defendants is liable to repair the damages sustained by Plaintiffs and Spizer as a result of their tortious conduct.

**J. COUNT TEN: VICARIOUS LIABILITY AND INSURANCE COVERAGE**

139.    The City of New Orleans is vicariously liable for Det. Calliouet's tortious conduct identified in this Complaint as causes 3-10 because Det. Calliouet was acting within the course and scope of his employment at the time he committed these wrongs.

140.    Gerald A. Turlich, Jr., as Sheriff of Plaquemines Parish, upon information and belief, is vicariously liable for Morice's tortious activity identified in this Complaint as causes 3-10 because Morice was acting within the course and scope of his employment at the time he committed these wrongs.

141.    Gerald A. Turlich, Jr., as Sheriff of Plaquemines Parish, is vicariously liable for Det. Wiltz's tortious activity identified in this Complaint as causes 3-10 because Det. Wiltz was acting within the course and scope of his employment at the time he committed these wrongs.

142.    Upon information and belief, Morice maintained professional liability insurance coverage that is reasonably anticipated to compensate Plaintiffs for all damages as alleged hereby. The professional liability insurance was arranged by Gilsbar, L.L.C., a Louisiana limited liability company domiciled in the Parish of St. Tammany ("Gilsbar"), with Morice having professional liability insurance provided by Continental Casualty Company, Inc., a subsidiary of CNA, a corporation domiciled in Chicago, Illinois ("Continental Casualty"). Accordingly, Gilsbar and Continental Casualty may be liable in whole or in part for the damages caused by Morice.

143.    Upon information and belief, Hammel's lawyers' professional liability insurance coverage was arranged for by Gilsbar, with Hammel having professional liability insurance provided by Continental Casualty. Accordingly, Gilsbar and Continental Casualty may be liable

in whole or in part for the damages caused by Hammel.

## VI. DAMAGES

144.    While Morice falsely painted himself as the victim of a pattern of stalking, harassment and intimidation by Plaintiffs, it is Morice who has engaged in a pattern of harassment and character assassination against Plaintiffs, who were wrongly accused by Morice of stalking solely because they conducted valid discovery to defend themselves and determine the truth in the Pool Case.

145.    Upon learning that Plaintiffs were not involved in any of the conduct alleged to be stalking and harassment, Morice failed to immediately mitigate the damages by admitting he was wrong and dismissing Plaintiffs from the Morice T.R.O. action. Although Morice eventually dismissed Ted Ladner and Ladner's Pool, he did so only after forcing them to expend large sums of money to defend themselves; and Morice has refused to dismiss Whalen.

146.    Even after being faced with incontrovertible evidence showing that Plaintiffs and Spizer were innocent of any wrongdoing, Morice stubbornly continued making false and defamatory statements against Plaintiffs and Spizer.  To date of this filing, Morice has demanded that Plaintiffs re-submit to further depositions in the Morice T.R.O., and has threatened Plaintiffs with additional contempt motions in the Morice T.R.O. case which Morice knows are groundless and meritless.

147.    Morice's conduct is particularly egregious as to Plaintiffs in that it seeks to damage Plaintiffs for their lawful pursuit of discovery in the Pool Case.

148.    Morice has caused Plaintiffs significant financial harm as Plaintiffs were forced to hire several different attorneys to defend them against the serious defamatory and criminal

allegations brought by Morice and to work towards fashioning a legal remedy to mitigate the damage done to Plaintiffs' reputations by Morice's reckless and malicious actions. Plaintiff Whalen was compelled to withdraw from representing Ladner and Ladner's Pools due to the requirement that she be a witness in these mastters due to the improper actions of Morice. Whalrn has suffered a loss of future earnings as a result of Morice's actions.

149.    In addition, Plaintiffs have spent a significant amount of time assisting their respective counsels with the preparation of pleadings, reviewing documents and developing a strategy to extricate themselves from the reckless mess that Morice has so callously created. This has drawn time away from Whalen's own law practice and professional activities, causing additional financial harm.  Ted Ladner and Ladner's Pools have been similarly injured in their business activities.

150.    The serious and outrageous false allegations brought against Plaintiffs by Morice have tarnished their reputations and disrupted their personal lives, causing them mental anguish and emotional distress and adversely affecting their quality of life.

151.    In particular, Morice's false accusation that Whalen attempted to murder him by hitting and driving over him with her car on April 24, 2019 has caused Whalen to suffer mental anguish, emotional and physical distress, and has adversely affected the quality of her life. Ms. Whalen has incurred lost earnings, loss of future earnings, mental anguish, past and future medical expenses, expenses including attorney fees, and other damages as will be proven at trial.

152.    Morice brought the Morice T.R.O. action during and in furtherance of his representation, as an attorney licensed to practice law in the State of Louisiana, of himself personally and Heidi Nuss in the Pool Case, hoping to gain a tactical advantage in the case by

having the Court issue a TRO against the defendants that would, in effect, severely restrict Whalen's ability to conduct discovery and represent her former clients..

153.    Morice's actions were also designed to gain tactical advantages in the Pool Case and push Ladner's Pools and Ted Ladner to capitulate to Morice's demands in the Pool Case.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Defendants hereinabove named be cited to appear and answer, and that on final trial this Honorable Court:

1.    Find that NOPD Det. Roger Caillouet and PPSO Det. Wiltz individually deprived Plaintiffs of a civil right in violation of 42 U.S.C. § 1983;

2.    Find that NOPD Det. Roger Caillouet, and Mark E. Morice individually violated the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721-2725, specifically § 2722(a), (b), and (c);

3.    Find that Det. Caillouet's false statement that the motor vehicle co-registered in the name of the Plaintiff was involved in the criminal act of "hit and run" and which was published into public records constitutes defamation per se;

4.    Find that Mark E. Morice's false statements that Plaintiffs engaged in criminal conduct including stalking, harassing, intimidating Morice and his family and other inappropriate behavior constitute defamation per se, and that Gilsbar, L.L.C. and Continental Casualty Company, Inc. are responsible for the consequences of Morice's actions to the extent they provide lawyers' professional liability insurance coverage to Morice;

5.    Find that Douglas S. Hammel's false statements, including that Whalen engaged

in "completely unprofessional and irresponsible conduct," are malicious and defamatory and that Gilsbar, L.L.C. and Continental Casualty Company, Inc. are responsible for the consequences of Douglas S. Hammel's actions to the extent they provide lawyers' professional liability insurance coverage to Hammel;

6. Order the City of New Orleans and the NOPD to permanently remove from their records the false statement that the vehicle co-registered to the Plaintiff was involved in a "hit and run;"

7. Enter judgment against the defendants for actual damages, including, but not limited to attorney's fees and other litigation costs incurred by the Plaintiffs in the Morice T.R.O. action, lost income resulting from time spent defending against the Morice T.R.O. action, damage to Plaintiffs' reputation and mental anguish and emotional distress, and past and future medical expenses, suffered by Plaintiffs due to the actions of Defendants in the amount determined by this Honorable Court, in an amount not less than $750,000.00, to be allocated among the Defendants as the Court deems appropriate;

8. Enter judgment against Det. Roger Caillouet and Mark E. Morice for punitive damages in the amount of $750,000.00 for the willful and reckless disregard of the law for their willful and reckless disregard of the law as provided by 18 U.S.C. § 2724(b)(2).

9. Find that Morice, assisted by the NOPD, PPSO, and Hammel, committed an abuse of process under Louisiana law and enter an award of damages in favor of Plaintiffs;

10. Find that Morice, assisted by Det. Calliouet, Det. Wiltz, and Hammel, committed

an abuse of right under Louisiana law and enter an award of damages against them in favor of Plaintiffs;

11. Find that Morice, assisted by Det. Calliouet, Det. Wiltz, and Hammel, committed intentional infliction of emotional distress against Plaintiffs and enter an award of damages against them in favor of Plaintiffs;

12. Find that Morice committed malicious prosecution and enter an award of damages against him in favor of Plaintiff;

13. Find that the Defendants are liable for their tortious conduct under La. Civ. Code art. 2315 and enter an award of damages against them in favor of Plaintiff;

14. Find that the City of New Orleans is vicariously liable for the tortious conduct as described in causes 3-10 pursuant to state law;

15. Find that Sheriff Gerald Turlich, Jr. is vicariously liable for the tortious conduct as described in causes 3-10 pursuant to state law;

16. Find that Gilsbar and Continental Casualty Company are answerable in whole or in part for the conduct of their insureds;

17. That the Court enter an award for attorney's fees and other costs incurred by the Plaintiff in this action to be allocated among the Defendants, pursuant to 42 U.S.C. §§ 1983 and 1988, and 18 U.S.C. §2724(b)(3), and/or other bases as the Court deems appropriate; and

18. That the court award interest on all damages, and that it grant such other relief, equitable or otherwise, to which the Plaintiffs may be entitled.

Respectfully submitted,

*S/Joseph Paul Rumage, Jr.*

Joseph Paul Rumage, Jr. (La. Bar #1574)

P.O. Box 1174

Denham Springs, LA  70727

Telephone: (504) 458-3999

Facsimile: (504) 243-4735

Email: RumageLawOffice@cs.com

ATTORNEY FOR SARAH WHALEN,

THEODORE A. "TED" LADNER, and

LADNER'S INDUSTRIES CO.